OPINION
Plaintiffs-appellants, David Gardner ("Gardner") and his wife Diane Herson (collectively referred to as "appellants"), appeal from a judgment of the Franklin County Court of Common Pleas granting summary judgment in favor of defendants-appellees, Sports Car Club of America ("SCCA") and Ohio Valley Region Sports Car Club of America ("Ohio Valley," collectively referred to as "appellees").
On June 13, 1999, Gardner was racing in an appellees-sanctioned car race at the Mid-Ohio Sports Car Course in Lexington, Ohio. The race was governed by the General Competition Rules ("GCR") that regulate road races throughout the nation. The Mid-Ohio course is a 2.4 mile road race course with 15 turns. The start of the course consists of a straightaway followed by a left-hand turn ("Turn 1") about 1/8 of a mile from the start/finish line. After exiting Turn 1, there is a shorter straightaway before reaching Turn 2.
In Gardner's race, there were two different classes of cars, 14 Mazdas and 24 Fords, racing together. Gardner was driving in the Ford group. Because this race involved two classes of cars racing together, appellees conducted a "split start." A split start is when one class of cars is started first and shortly thereafter, the second class of cars is started. Split starts are recommended by the GCR when there is a "large differential in speed or cornering ability between the classes or categories in a single race group." Split starts are intended to create safer starting conditions by separating the classes of cars at a time when traffic congestion is likely to be the greatest.
In this race, the Mazdas were started first. After the Mazdas received a green flag to indicate the start of the race, but before the Fords reached the start/finish line, one of the Mazdas spun out just past Turn 1. That Mazda stalled and came to rest on the track somewhere between the exit to Turn 1 and the beginning of Turn 2, headed towards Turn 2.
There are flagging stations located on every turn at Mid-Ohio where "flaggers" (track officials) utilize a series of different colored flags to inform and warn drivers, when appropriate, of events or conditions taking place on the race course between each flagging station. Such a station was located just before the entrance to Turn 1 on the driver's right side. When the Mazda stalled on the course, a flagger located at another station told the flagger at Turn 1 to "waive it, 1." This information alerted the flagger at Turn 1 to waive a yellow flag warning drivers that a serious hazard was present between Turn 1 and Turn 2. Pursuant to the GCR, a waiving yellow flag indicates that great danger exists on the course and drivers should slow down, be prepared to stop, and may not pass until past the emergency area.
Shortly after the flagger at Turn 1 began waiving the yellow flag, the Fords came up to the start/finish line where they received a green flag from the starter. It appears that 15 to 30 seconds elapsed between the time the Mazdas started and when the Fords reached the start/finish line. It is undisputed that, when the Fords reached Turn 1, the flagger at that station was waiving the yellow flag. Unfortunately, Gardner completed Turn 1 and then crashed into the stalled Mazda, suffering serious physical injuries, including the amputation of both of his legs above the knees. Thereafter, Gardner filed a complaint alleging his injuries were the direct and proximate result of the "wilful and wanton misconduct" of appellees. His wife also asserted a loss of consortium claim.[1]
After extensive discovery, appellees moved for summary judgment on all claims, arguing that there was no evidence demonstrating willful or wanton misconduct and, therefore, they were entitled to judgment as a matter of law. The trial court granted appellees' motion.
Appellants appeal, assigning the following error:
 The Trial Court Erred In Granting Summary Judgment In Favor Of Defendant-Appellees.
An appellate court's review of summary judgment is conducted under a de novo standard. Coventry Twp. v. Ecker (1995), 101 Ohio App.3d 38, 41; Koos v. Cent. Ohio Cellular, Inc. (1994), 94 Ohio App.3d 579, 588. Summary judgment is proper only when the parties moving for summary judgment demonstrate: (1) no genuine issue of material fact exists; (2) the moving parties are entitled to judgment as a matter of law; and (3) reasonable minds could come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence most strongly construed in its favor. Civ.R. 56; State ex rel. Grady v. State Emp. Relations Bd. (1997), 78 Ohio St.3d 181, 183.
The trial court applied the definitions of willful and wanton misconduct found in this court's recent decision in Hunter v. City of Columbus (2000), 139 Ohio App.3d 962, 968. The trial court correctly recognized that willful and wanton misconduct describe two distinct legal standards. In Hunter, we defined wanton misconduct as:
 * * * "[A] degree greater than negligence." * * * This conduct is characterized by "the failure to exercise any care toward one to whom a duty of care is owed when the failure occurs under circumstances for which the probability of harm is great and when the probability of harm is known to the tortfeasor." * * * [Id. at 969.]
Essentially, wanton misconduct is the failure to exercise any care. Id. Wanton misconduct has also been likened to conduct that manifests a "disposition to perversity." Seymour v. New Bremen Speedway (1971),31 Ohio App.3d 141, 148, quoting Roszman v. Sammett (1971),26 Ohio St.2d 94, paragraph two of the syllabus. "'[M]ere negligence is not converted into wanton misconduct unless the evidence establishes a disposition to perversity on the part of the tortfeasor.'" Fabrey v. McDonald Police Dept. (1994), 70 Ohio St.3d 351, 356, quoting Roszman, supra.
It is undisputed that the flagger positioned before Turn 1 waived a yellow flag as soon as the Mazda stalled on the track and continued waiving it while the Fords passed his station. Pursuant to the GCR, a waiving yellow flag warns drivers of a great danger ahead on the course and that they should slow down and be prepared to stop. The display of this waiving yellow flag, a warning to drivers that they should be aware of a great danger on the course, is sufficient evidence to preclude a finding of wanton misconduct.
Appellants contend that appellees took only token care to prevent this accident and that token care is insufficient to insulate appellees from liability under a wanton standard. Although token care may not be enough, waiving a yellow flag under these circumstances cannot be characterized as token care. Waiving flags are precisely the way track officials communicate with drivers and warn them of potential hazards. Accordingly, even when the evidence is viewed in a light most favorable to appellants, reasonable minds can only conclude that there was no breach of duty under the wanton misconduct standard.
In Hunter, we also defined "willful misconduct" as:
 "* * * '[S]omething more than negligence and it involves a more positive mental state prompting the injurious act than does wanton misconduct.' * * * The intention underlying such misconduct relates to the misconduct, not the result. Thus, `willful' misconduct is an `intentional deviation from a clear duty or from a definite rule of conduct, a deliberate purpose not to discharge some duty necessary to safety, or purposely doing wrongful acts with knowledge or appreciation of the likelihood of resulting injury.' * * *" [Id. at 969-970.]
Willful misconduct involves "an intent, purpose, or design to injure." Zivich v. Mentor Soccer Club, Inc. (1998), 82 Ohio St.3d 367, 375, quoting McKinney v. Hartz Restle Realtors, Inc. (1987),31 Ohio St.3d 244, 246. Willful misconduct is something more than negligence and it imports a more positive mental condition prompting an act than wanton misconduct. Phillips v. Dayton Power Light Co. (1994), 93 Ohio App.3d 111, 119, citing Tighe v. Diamond (1948),149 Ohio St. 520, 526-527.
Appellants argue that starting the Fords with a green flag when the starter knew there was a waiving yellow flag at Turn 1 and a stalled Mazda on the track between Turn 1 and Turn 2, violated GCR 9.4.2, which states, in relevant part, that, "when displayed, the green flag indicates that the course is clear." Appellants reason that, because the course was not clear (i.e., there was a stalled Mazda on the track at some point after Turn 1), the starter violated the rule by waiving the green flag to start the Fords.
However, it is doubtful that this rule was intended to apply to the second class of cars when a split start is utilized. When a split start is used, GCR 7.6 provides, in relevant part:
 The second group also should be led by a pace car which should keep the first group in site (on the longest straight). If the first group gets a green flag, then the second group will automatically start. * * * [Emphasis sic.]
Testimony from the starter that day, Randall Holton, and two race officials on the course that day, also indicated that, once a green flag is given to the first group, the second was automatic. Appellants' expert witness testified that this was also his understanding of the rule.
Furthermore, when there is a split start, the track ahead of the second starting class can never be literally "clear" because the other class of cars has already begun racing. Even though a split start is utilized, there are not two races. All of the cars were in one race that day, and the race was started when the starter displayed the green flag to the Mazdas. After that initial green flag, the starter and two officials testified that the starter's role was to watch the track between the starting line and Turn 1. Any hazard arising in that area would be indicated to the drivers by the starter waiving a yellow flag. Once the race begins, the starter, in essence, becomes another flagging station. In this instance, a waiving yellow flag was not required to be displayed by the starter because there was no hazard in the stretch between the start/finish line and Turn 1. The hazard occurred after Turn 1. As previously indicated, the flagger at Turn 1 waived a yellow flag to warn drivers of the hazard. A waiving yellow flag indicated that there was a serious hazard on the course between flagging station 1 and the next flagging station, and drivers should be prepared to stop.
While appellants' expert testified that it would have been safer for the starter to display a waiving yellow flag at the start, instead of a green flag, or to continue the Fords on another pace lap, this evidence is not sufficient for reasonable minds to find the violation of a clear duty under GCR Rules. It should be noted that appellants' expert acknowledged that, if the same circumstances occurred on the second lap, the waiving yellow flag at Turn 1 would have been sufficient to warn upcoming drivers of the stalled Mazda. Even if there is some ambiguity in the GCR Rules when a split start is used, reasonable minds can only conclude that, under these circumstances, there was no intentional deviation from a clear duty or definite rule of conduct. Therefore, there was no breach of duty under a willful misconduct standard.
Appellants argue that the trial court misapplied Hunter by failing to define willful misconduct as the equivalent of reckless misconduct. We disagree. First, we limited our holding in Hunter to claims arising under R.C. Chapter 2744, which includes the concept of reckless in R.C.2744.03(A)(6). Second, even if the definition of reckless discussed in Hunter were applied, the result would be the same. Conduct that does not meet a willful standard could not meet a reckless standard as defined in Hunter. Third, it is clear that the applicable legal standard under these circumstances is willful and wanton not reckless. Bowen v. Kil-Kare, Inc. (1992), 63 Ohio St.3d 84, 90. A number of courts have applied the willful and wanton standard in cases involving participants in recreational activities who signed releases of liability and later sued promoters or managers of the activity. See, e.g. Zivich, supra (soccer participant); Guysinger v. K.C. Raceway, Inc. (1990), 54 Ohio App.3d 17,17-18 (race car spectator); Jowett v. Brandywine Ski Resort, Inc. (1999), Summit App. No. 19322 (skier); Seymour v. New Bremen Speedway (1971), 31 Ohio App.2d 141, 148 (race car driver). None of these cases include the concept of reckless in defining willful and wanton.
Although appellants do not address the propriety of the trial court's grant of summary judgment on the loss of consortium claim and, therefore, we need not address that issue under App.R. 12(A)(2) this claim is subject to the same willful and wanton standard because both Gardner and his wife released appellees from all liability prior to the commencement of the race. Therefore, the trial court did not error in granting summary judgment on this claim as well.
Construing all of the evidence in the record in the light most favorable to appellants, we find there are no issues of material fact and reasonable minds could only come to one conclusion, that conclusion being adverse to appellants. Appellees did not breach any duty owed to appellants under a willful and wanton standard. There was no intent to harm Gardner nor was there any intentional deviation from a clear duty to protect Gardner.
Accordingly, we overrule appellants' single assignment of error and affirm the judgment of the Franklin County Court of Common Pleas.
Judgment affirmed.
PETREE and BROWN, JJ., concur.
[1] It should be noted that, before racing, appellants both signed a document releasing appellees from all liability arising from Gardner's participation in the race. However, pursuant to Bowen v. Kil-Kare, Inc. (1992), 63 Ohio St.3d 84, 90, such a document does not release claims for willful or wanton misconduct.